UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

YASMINE OUTLAW,

                      Plaintiff,

       v.                                  Case No. 19-CV-1092

THE VILLAGE OF SHOREWOOD, et al.,

                      Defendants.

## DECISION AND ORDER

### 1. Background

On November 2, 2016, the manager of a used clothing store in Shorewood contacted the Shorewood Police Department to report that one of the store's former employees, plaintiff Yasmine Outlaw, had stolen about $500 of merchandise. (ECF Nos. 34, ¶¶ 1-3; 36, ¶ 8.) Shorewood Police Officer Anthony Miller went to the store and spoke with the manager, who explained that she had reviewed surveillance video that showed Outlaw stealing merchandise at the end of her shift on October 20, 2016. (ECF No. 34, ¶¶ 4-7.) Miller was told that the value of the merchandise was about $500.00. (ECF No. 36, ¶ 8.)

The manager explained that, although the store had closed at 6:00 PM, Outlaw was still in the store until 8:40 PM. (ECF No. 34, ¶¶ 8-9.) Moreover, Outlaw's mother was in the store, and the pair left through a door other than the one usually used by employees. (ECF No. 34, ¶¶ 10-11.) The manager told Miller that she had tried repeatedly to get in touch with Outlaw to resolve the matter without involving the police, but Outlaw had not responded. (ECF Nos. 34, ¶¶ 12-14; 36, ¶ 9.)

Miller called Outlaw twice in an attempt to talk to her about the theft complaint, but Outlaw did not return his calls. (ECF Nos. 34, ¶¶ 17-18; 36, ¶ 12.) Outlaw does not recall receiving any messages from Miller. (ECF No. 36, ¶ 13.) Having had no success in speaking with Outlaw, Miller and another Shorewood police officer, Cy Kaderlik, went to her home on November 3, 2016, arriving at about 10:00 PM. (ECF No. 34, ¶ 19.)

The officers first spoke with Outlaw's mother, after which Outlaw came outside, walked several feet away to a nearby short chain link fence, and began to speak to Miller about the complaint. (ECF No. 34, ¶¶ 21-22.) Outlaw denied the theft allegation, deflecting Miller's questions and becoming evasive. (ECF Nos. 34, ¶¶ 24-25; 36, ¶ 21.) "Outlaw advised Officer Miller that she had receipts for clothes she had purchased [on] October 20, 2020 [sic]." (ECF No. 36, ¶ 22[1].)

---

[1] In her proposed findings of fact Outlaw states, "Outlaw denied being involved in any theft on October 20, 2020 and told Officer Miller that [her manager] was crazy and a racist," and "Outlaw advised Officer Miller that she had receipts for clothes she had purchased October 20, 2020." (ECF No. 33, ¶¶ 21, 22.) Although the defendants admit that these facts are true, the year is wrong. The events took place in 2016.

2

Miller told Outlaw that, if she paid the $500 for the merchandise, the issue would go away. (ECF No. 36, ¶ 24.) If she did not, he would have to arrest her. (ECF No. 24-3 at 18, 63:23-24.) When Outlaw refused to pay, Miller proceeded to attempt to arrest her. (ECF No. 36, ¶ 28.)

When Miller grabbed Outlaw's arm in an attempt to handcuff her, Outlaw pulled away. (ECF No. 34, ¶¶ 27-28.) A struggle ensued, with Outlaw trying to get away from Miller. (ECF No. 34, ¶¶ 30, 33.) During the scuffle, according to Outlaw, she "fell into the fence" (ECF No. 24-3 at 18, 64:5-6), and Miller pinned her against the fence and garbage can (ECF Nos. 34, ¶¶ 22, 29-30, 33; 36, ¶ 29). Outlaw's mother then walked toward Miller, yelling and demanding that he "stop" and "let her go." (ECF Nos. 34, ¶ 31; 36, ¶ 31.) Outlaw told Miller to stop and that he was hurting her. (ECF No. 36, ¶ 33.) Outlaw continued "squirming around," and Miller warned Outlaw that he would use his Taser if she did not stop resisting. (ECF Nos. 34, ¶ 33-34; 36, ¶¶ 32, 34.) He never drew or deployed his Taser. (ECF Nos. 34, ¶ 35; 36, ¶ 34.)

Outlaw's mother then "sandwiched" herself between Miller and Outlaw. (ECF No. 34, ¶ 36.) Outlaw continued struggling and physically resisting Miller, and her mother began to try to pull Outlaw from Miller's grasp, resulting in a "tug of war." (ECF No. 34, ¶¶ 36-37; *see also* ECF No. 36, ¶ 37.) Miller responded with a takedown maneuver whereby Miller, Outlaw, and Outlaw's mother all fell to the ground. (ECF Nos. 34, ¶ 37; 36, ¶ 38.) Because Outlaw was struggling and physically resisting (aided

3

by her mother), Miller could not control how Outlaw landed, and Outlaw's mother landed on top of her. (ECF No. 34, ¶¶ 37-38.) Shortly thereafter, Outlaw's mother released Outlaw, and Outlaw stopped resisting. (ECF No. 34, ¶ 40.) Miller was able to handcuff Outlaw, and he helped her off the ground and placed her in his squad car. (ECF No. 34, ¶ 40-42.)

On their way to the Shorewood Police Station Outlaw stated she was having trouble breathing. (ECF No. 34, ¶ 42; *see also* ECF No. 36, ¶ 46.) Miller stopped the squad car, called for an ambulance, and Outlaw was transported to a hospital, where she was medically cleared. (ECF No. 34, ¶¶ 43-45.)

Outlaw was issued a municipal citation for retail theft. (ECF No. 34, ¶ 46.) After a trial at which Outlaw was represented by counsel (ECF No. 34, ¶ 47), Outlaw was convicted of theft (ECF No. 34, ¶ 48).

Outlaw filed this action in Milwaukee County Circuit Court alleging that the Village of Shorewood, Miller, and Kaderlik violated the Fourth and Fourteenth Amendments by depriving her of "due process of law" and "using excessive force." (ECF No. 3-1, at 4, ¶ 2; 5-6, ¶ 11.) The defendants removed the action to federal court (ECF No. 1), which has jurisdiction under 28 U.S.C. § 1331. All parties have consented to the full jurisdiction of this court under 28 U.S.C. § 636(c). (ECF Nos. 8, 9, 14.)

The defendants have moved for summary judgment (ECF No. 20) and to exclude Outlaw's expert witness (ECF No. 26). The briefing on these motions is closed and both are ready for resolution.

## 2. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## 3. Analysis

### 3.1. False Arrest

Outlaw devotes much of her response to arguing that Miller could have done more investigation into the theft allegation before he arrested her. But such arguments

5

are relevant only to a claim of false arrest, and no such claim is included in her complaint. (ECF No. 3-1.) Nor does she directly argue in her response that she was wrongfully arrested. (ECF No. 30 at 11-15). For example, the section of her response in which she offers arguments that might be generously construed as supporting a claim of false arrest is headed, "Defendants are not entitled to summary judgment on the plaintiff's excessive force claims against officers Miller and Kaderlik." (ECF No. 30 at 11.)

To the extent that Outlaw may now be attempting to constructively amend her complaint to add a false arrest claim, *cf. Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005), it would be denied on the basis that there is no merit to any such claim.[2]

The existence of probable cause to believe that Outlaw committed retail theft would defeat any claim of false arrest. *Conner v. Vacek*, 806 F. App'x 485, 489 (7th Cir. 2020). "Probable cause is a determination made from assessing whether, based on the facts and circumstances at the time of the arrest, a reasonable officer would conclude

---

[2] The defendants argue that any false arrest claim is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), by Outlaw's subsequent conviction for retail theft. (ECF No. 21 at 9-10.) Outlaw does not respond to this argument. As such, the court would normally grant the defendants' motion as unopposed. "Failure to respond to an argument … results in waiver." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). However, the defendants' *Heck* argument is wrong. "*Wallace v. Kato*, 549 U.S. 384 (2007), holds that a claim of wrongful arrest may proceed even if a person has been convicted of the offense that led to the arrest. Whether the police had probable cause to arrest is distinct from the question whether a criminal conviction, on a different factual record or a guilty plea, is valid." *Johnson v. Rogers*, 944 F.3d 966, 968 (7th Cir. 2019). Therefore, in addressing whether Outlaw has a viable claim for false arrest, the court considers only whether there was probable cause to arrest Outlaw.

that the suspect has committed or is committing a crime." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 706 (7th Cir. 2012). Stated another way, "Probable cause exists if, at the time of arrest, the officers possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that a suspect has committed, or is committing, a crime." *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005).

"Probable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *Breit*, 429 F.3d at 728. "[P]olice officers are entitled to rely on their experience in assessing probable cause," and therefore "their judgments deserve deference." *Id*.

The allegations of the store manager were sufficient to provide probable cause for arresting Outlaw for retail theft, especially when corroborated by additional circumstantial evidence, such as Outlaw's presence in the store long after closing, the presence of Outlaw's mother in the store after closing, Outlaw's refusal to return either the store manager's or Miller's messages, and her evasiveness to Miller's questions. *See United States v. Jefferson*, No. 09-CR-7, 2009 U.S. Dist. LEXIS 22324, at *10 (E.D. Wis. Mar. 17, 2009) (noting that a citizen witness who voluntarily provides information to police is entitled to a presumption of reliability); *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986) (finding probable cause to arrest for retail theft based on security guard's statements regarding a theft).

7

That Outlaw subsequently had explanations for some of these details (*e.g.*, that she showed Miller a receipt the following day (ECF No. 36, ¶ 16), that she testified that her mother was in the store because previously "she was approached in the back of the store by two people" (ECF No. 36, ¶ 6), and that she testified that the time-stamp on the surveillance video must have been wrong because she was not in the store until 8:40 pm (ECF No. 36, ¶ 5)) is inconsequential. Probable cause is assessed based on what the police officer knew at the time of the arrest. *Matthews*, 675 F.3d at 706. Miller was not required to personally view the surveillance video or verify the value of the stolen merchandise. Nor was Miller required to credit Outlaw's denials or her claim to have receipts. *See Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006) ("[P]olice officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness. They may simply arrest the accused suspect." (internal citation omitted)). While Miller probably could have done more to investigate before deciding to arrest Outlaw, that is routinely true whenever a police officer decides to make an arrest. The constitution is concerned not with whether a police officer could have done more but only whether a police officer did enough. Miller did enough and had probable cause to arrest Outlaw. Therefore, any claim for false arrest would fail.

**3.2. Excessive Force**

Probable cause to arrest, of course, does not foreclose a claim that a police officer used excessive force in effecting that arrest. *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 724 (7th Cir. 2013). "A claim that an officer employed excessive force in arresting a person is evaluated under the Fourth Amendment's objective-reasonableness standard." *Id*. "Reasonableness" lacks precise definition but requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). Relevant factors include "the severity of the crime, whether the arrestee poses an immediate threat to the safety of the officers or others, and whether he or she is actively resisting arrest or attempting to flee and evade arrest." *Id*. Reasonableness is assessed based on the information known to the officer at the time the force is used. *Id*.

Given "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—," *Abbott*, 705 F.3d at 724 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)), they are given "considerable leeway" with respect to their assessments as to the appropriate amount of force to use in a particular situation, *id.* (quoting *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009)). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting

9

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "Whether a particular use of force was objectively reasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)).

It is unclear what specifically Outlaw alleges constituted an excessive use of force. It appears she may be alleging that it was excessive for Miller to have even grabbed her arm in an attempt to arrest her. She argues that, because she was charged only with a non-criminal ordinance violation, Miller did not need to arrest her and instead could have mailed her a citation.

While it is true that Miller could have opted to forego arresting Outlaw altogether, he was not required to do so. A police officer may arrest a person for even the most minor of offenses, such as failing to wear a seatbelt, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), violating a municipal ordinance regarding the selling of tickets, *Chortek v. City of Milwaukee*, 356 F.3d 740, 745 (7th Cir. 2004), engaging in disorderly conduct, gambling, peddling without a license, failing to stop at a stop sign, or walking a dog without a leash, *Portis v. City of Chi.*, 613 F.3d 702, 703 (7th Cir. 2010).

When a police officer has probable cause to arrest a person, there is nothing excessive about the officer grabbing that person to effect the arrest. *See Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it."). Outlaw does not allege that Miller's action in grabbing her arm was violent or unnecessarily painful; she alleges simply that he grabbed her arm. That, as a matter of law, was not excessive force.

Outlaw responded by pulling away from Miller (ECF No. 34, ¶ 28), at which point she "fell into the fence" (ECF No. 24-3 at 18, 64:5-6 (Outlaw's testimony); *see also* ECF No. 24-1 at 10, 36:1-4 (Miller's testimony)). It is undisputed that Miller then "pinned" Outlaw against the short chain link fence and a neighbor's garbage can. (ECF No. 36, ¶¶ 28-29.) Outlaw submits no evidence from which a reasonable finder of fact could conclude that it was unconstitutionally excessive force for Miller to have pinned her against the fence and garbage can. She alleges merely that Miller "continued to push the middle of her back with his arm or hand" and was "pulling on" her (ECF No. 36, ¶¶ 29-30) for a few seconds (ECF No. 24-3 at 20, 73:12-18) while she continued "squirming" amidst a "scuffle" with him (ECF Nos. 34, ¶ 33; 36, ¶ 32).

After coming into contact with the fence Outlaw continued to actively resist, and her mother escalated the situation by coming to her daughter's aid and physically interjecting herself into the scuffle. Outlaw's allegation that Miller used excessive force by "yanking [her] arms" (ECF No. 3-1, ¶ 11) is meritless. There is no hint that any yanking was anything other than the force reasonably necessary to attempt to overcome Outlaw's attempts to pull away from Miller and her mother "yanking" on her other side in a "tug of war."

11

In the face of Outlaw's continued active resistance, now aided by her mother, Miller then threatened to use a Taser on Outlaw. Setting aside questions of whether a mere threat, unaccompanied by even drawing the weapon, could ever constitute "excessive force," *see Salvodon v. Ricotta*, No. 07-CV-174 (ENV) (LB), 2013 U.S. Dist. LEXIS 106132, at *20 (E.D.N.Y. July 14, 2013), it was entirely reasonable under these circumstances for Miller to threaten to use an incapacitating electroshock weapon, *see Abbott*, 705 F.3d at 725-26 (discussing the operation and effects of Tasers), on Outlaw. In fact, given Outlaw's active and violent resistance, the actual use of a Taser likely would not have been excessive. *See id.* at 730. But, again, Miller neither used nor even drew his Taser.

Outlaw's mother then further escalated matters by "sandwiching" herself between Miller and Outlaw. (ECF No. 34, ¶ 36.) Miller responded with a "takedown maneuver" that resulted in him, Outlaw, and her mother falling to the ground. (ECF No. 34, ¶ 37.)

Faced with a person actively resisting arrest and a third party physically aiding that resistance, a "takedown," or in the sanitized language common in police jargon, "decentralization," *see Diebitz v. Arreola*, 834 F. Supp. 298, 301 (E.D. Wis. 1993); *Carter v. Belz*, No. 12-cv-301-slc, 2013 U.S. Dist. LEXIS 150042, at *6 (W.D. Wis. Oct. 18, 2013), was not an unconstitutionally excessive use of force. *See, e.g.*, *Barfell v. Romanowicz*, No. 15-C-653, 2016 U.S. Dist. LEXIS 174956, at *9 (E.D. Wis. Dec. 19, 2016) ("The officers properly

12

escalated from a verbal request to comply to a minimum use of force to a takedown and handcuffing."); *Gay v. City of E. Moline*, No. 4:12-cv-04066-SLD-JEH, 2014 U.S. Dist. LEXIS 87566, at *8, *29 (C.D. Ill. June 27, 2014) (holding that takedown was not excessive force when plaintiff stepped away from the officer and refused to get on the ground when the officer grabbed hold of him); *Benter v. Jahr*, No. 06-C-128-S, 2007 U.S. Dist. LEXIS 2418, at *4, *6-*8 (W.D. Wis. Jan. 10, 2007) (finding no excessive force when plaintiff refused command to stop, officer "grabbed both of [plaintiff]'s shoulders in an attempt to stop him[,] [plaintiff] refused to stop[, and officer] decentralized plaintiff to the ground"); *see also Dawson v. Brown*, 803 F.3d 829, 831 (7th Cir. 2015) (holding that it was not excessive for officers to kick and tackle a 72-year-old father who approached officers as they were attempting to arrest his son, who was resisting arrest).

The only authority Outlaw cites in support of her claim that the takedown was excessive is *Morfin v. City of E. Chi.*, 349 F.3d 989 (7th Cir. 2003). The court there concluded that disputes of material fact precluded summary judgment on the question of whether the force used was excessive because the plaintiff alleged he "was docile and cooperative" and "did not resist arrest in any way prior to the officers' use of excessive force." *Id.* at 1005. In contrast, Outlaw does not dispute that she was actively resisting Miller's attempts to arrest her when he used the takedown maneuver.

13

Given the totality of the circumstances, most notably the fact that Outlaw (and her mother) physically resisted, each of Miller's actions were reasonable under the Fourth Amendment.

Because Miller did not violate Outlaw's constitutional rights, it is unnecessary to address his argument that he is entitled to qualified immunity. *See Dawson*, 803 F.3d at 835. But ample caselaw demonstrates that the question of qualified immunity is easily resolved in Miller's favor and provides an alternative basis for granting the defendants' motion for summary judgment. *See, e.g., Johnson v. Rogers*, 944 F.3d 966, 970 (7th Cir. 2019) (affirming finding of qualified immunity to an officer who delivered a kick or leg sweep to handcuffed plaintiff, resulting in a compound fracture of plaintiff's leg, after plaintiff said he wanted to run away and attempted to stand up) (citing *Kelsay v. Ernst*, 933 F.3d 975 (8th Cir. 2019) (qualified immunity for a bear-hug takedown when an angry suspect walked away from the officer for the second time); *Shafer v. Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017) (qualified immunity for a leg-sweep takedown when the intoxicated suspect tried to pull away); *Hedgpeth v. Rahim*, 893 F.3d 802, 436 U.S. App. D.C. 301 (D.C. Cir. 2018) (qualified immunity for an arm takedown accompanied by a knee to the rear of the leg of a suspect who had pulled his hands away from the cuffing procedure)); *Boothe v. Sherman*, 190 F. Supp. 3d 788, 799-800 (N.D. Ill. 2016) (finding that, regardless of whether force was excessive, officer was entitled to qualified immunity for using a "straight-arm takedown" when a juvenile pulled her arm away from an officer

escorting her); *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (finding it "economical" to address only qualified immunity and holding that officer was entitled to qualified immunity for grabbing and tackling the plaintiff when he removed a memory card from a camera that recorded evidence related to a trespassing complaint); *Anderson v. City of W. Bend Police Dep't*, 774 F. Supp. 2d 925, 948-52 (E.D. Wis. 2011) (finding that using a takedown maneuver on a person who had just emerged from the shower and was not physically resisting may have been excessive force but the police officer defendant was entitled to qualified immunity); *Teynor v. King*, No. 01-C-146-C, 2002 U.S. Dist. LEXIS 27127, at *25 (W.D. Wis. Feb. 7, 2002) (holding that police officer was entitled to qualified immunity for using a takedown on the plaintiff when the plaintiff, in his version of events, was walking away from the officers).

### 3.3. Other Defendants

Outlaw alleges in her complaint that Kaderlik also used excessive force. (ECF No. 3-1, ¶¶ 11, 14.) She reiterates these allegations in her response to the defendants' motion. (ECF No. 30 at 11-12.) However, there is absolutely no evidence that Kaderlik used force of any sort on Outlaw. In fact, in her own proposed findings of fact (which the defendants substantively admit) Outlaw asserts that throughout the incident "Officer Kaderlik continued to stand by a few feet away and watch this incident unfold from a distance without taking any action to deescalate the situation or intervene." (ECF

15

No. 36, ¶ 43.) Thus, there is no plausible basis for any excessive force claim against Kaderlik.

In response to the defendants' motion for summary judgment Outlaw advances a new claim against Kaderlik—that he failed to intervene to stop Miller. (ECF No. 30 at 9-11.) This related but distinct claim, *see Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009) (discussing elements of a failure to intervene claim), was not included in Outlaw's complaint (ECF No. 3-1). But even if the court were to allow Outlaw to constructively amend her complaint to add a failure to intervene claim against Kaderlik, any such claim would fail. To proceed to trial on a claim for failing to intervene, Outlaw would be required to produce evidence that Kaderlik "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis*, 581 F.3d at 472. Because Miller's use of force was not excessive, Kaderlik cannot be liable for having not intervened.

Similarly, Outlaw's *Monnell* claim against the Village of Shorewood, *see Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 692 (1978), fails. Having not suffered any underlying constitutional injury, Outlaw lacks any claim against the village. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986).

Finally, Outlaw also repeatedly refers to Peter Nimmer as a defendant in the captions of her filings. (ECF Nos. 30 at 1; 33 at 1, 34 at 1.) Nimmer was the Shorewood

Chief of Police at the time of the events at issue. (ECF No. 25, ¶ 2.) However, he was never named as defendant (ECF No. 3-1) nor served. Thus, the court does not consider any potential claim against him.

**4. Motion to Exclude Plaintiff's Expert**

Because the defendants are entitled to summary judgment, it is unnecessary to address the defendants' motion to exclude the plaintiff's expert. Accordingly, that motion (ECF No. 26) will be dismissed as moot.

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 20) is **granted**. The plaintiff's complaint and this action are dismissed with prejudice. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the defendants' motion to exclude the plaintiff's expert (ECF No. 26) is **dismissed as moot**.

Dated at Milwaukee, Wisconsin this 8th day of February, 2021.

_William E. Duffin_
WILLIAM E. DUFFIN
U.S. Magistrate Judge

17

Case 2:19-cv-01092-WED   Filed 02/08/21   Page 17 of 17   Document 38